IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:17-CV-616-FL

| | |
|---|---|
| UNITED STATES OF AMERICA, ex. rel., )<br>SANTHOSH REDDY DEVARAPALLY, )<br>M.D., bringing this action on behalf of THE )<br>UNITED STATES OF AMERICA, and )<br>THE STATE OF NORTH CAROLINA, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>FERNCREEK CARDIOLOGY, P.A., a )<br>North Carolina Professional Association; )<br>MATTHEW A. DAKA, M.D.; )<br>SELVARATNAM SINNA, M.D.; SURIYA )<br>BANDARA JAYAWARDENA, M.D.; and )<br>MANESH THOMAS, M.D., )<br>)<br>Defendants. )<br>) | ORDER |

This matter is before the court on motion to dismiss (DE 52) by defendants.[1] Also before the court are four consent motions for protective orders. (DE 66-69). The motion to dismiss has been briefed fully, and in this posture, the issues raised are ripe for ruling. For the following reasons, the motion to dismiss is denied. The motions for protective orders are terminated where the court instructs the parties to propose a single protective order.

---

[1] The court dismissed former defendant Cumberland County Hospital System, Inc. ("Cumberland") from this action June 14, 2022 where relator stipulated to the dismissal of non-intervened claims, the United States and the State of North Carolina consented to such dismissal, and no claims remained against defendant Cumberland.

# STATEMENT OF THE CASE

Relator Santhosh Reddy Devarapally, M.D. ("relator") commenced this False Claims Act case with a complaint filed December 13, 2017, claiming that defendants submitted false claims to Medicare, Medicaid, and TRICARE in connection with medically unnecessary services over a period of about three years.

Relator, who is a cardiologist formerly employed by defendant Ferncreek Cardiology, P.A. ("Ferncreek"), asserted initially the following claims on behalf of the State of North Carolina and the United States (collectively, the "government") and himself.[2]

1) False claims in violation of the False Claims Act, 31 U.S.C. §3729(a)(1)(A);

2) False statements in violation of the False Claims Act, 31 U.S.C. §3729(a)(1)(B);

3) False claims in violation of N.C.G.S. §1-607(a)(1); and

4) False statements in violation of N.C.G.S. §1-607(a)(2).

Relator sought treble damages, civil penalties of $11,000 for each violation of North Carolina law and for each violation of federal law occurring on or before November 2, 2015; civil penalties of $21,916 for each violation of federal law occurring after November 2, 2015; civil penalties; costs; and fees.

Upon motions by relator and the government, the court extended the time to intervene seven times, until October 18, 2021. On that date, the court unsealed the case and allowed the

---

[2] The False Claims Act allows a person to bring a civil action "for the person and for the United States Government," wherein, as here, "[t]he action shall be brought in the name of the Government." 31 U.S.C. § 3730(b)(1). The government thereafter may elect to "proceed with the action, in which case the action shall be conducted by the Government; or . . . notify the court that it declines to take over the action, in which case the person bringing the action shall have the right to conduct the action." Id. § 3730(b)(4). Although the terms "relator" and "ex rel." are not defined in the statute, they are the names commonly used to denote a private individual suing on behalf of the government under the False Claims Act. E.g., Cochise Consultancy, Inc. v. United States ex rel. Hunt, 139 S. Ct. 1507, 1514 (2019).

government to intervene in part and to decline to intervene in part. In its complaint in intervention,[3] the government asserted causes of action under the False Claims Act for submission of false claims, false statements material to a false claim, and conspiracy as well as common law fraud, unjust enrichment, and payment by mistake. The government seeks treble damages, civil penalties, actual damages, costs, and interest.

Defendants filed the instant motion March 8, 2022 pursuant to Fed. Rs. Civ. P. 9(b) and 12(b)(6). The case was transferred to the docket of the undersigned June 2, 2022. Thereafter, the court noticed the parties that it was the undersigned's practice, pending decision on a motion that could dispose of the case, to stay discovery procedures unless a party objects. Receiving no objections, the court stayed all deadlines in the case. Defendants filed two consent motions for protective orders on January 10, 2023 (DE 66-67) and two more on February 14, 2023 following notice of deficiency by the clerk. (DE 68-69).

## STATEMENT OF FACTS

The relevant facts alleged in the complaint may be summarized as follows. Defendant Ferncreek is a Professional Association in North Carolina that provides a full range of cardiology services. (Compl. ¶¶ 18, 20). Defendants Matthew A. Daka, M.D. ("Daka"); Selvaratnam Sinna, M.D. ("Sinna"); and Manesh Thomas, M.D., ("Thomas"), have been partners in the practice since at least 2014, and Defendant Suriya Bandara Jayawardena, M.D., ("Jayawardena"), is a former partner on whose behalf Ferncreek billed claims at from at least 2014 to 2019. Relator worked for Ferncreek as a cardiologist during 2014 and 2015.

Medicare, Medicaid, and TRICARE ("the federal programs") are federally funded health care programs (Compl. ¶¶ 25, 69, 86). Medicare makes payments directly to providers (compl. ¶

---

[3] All references to the complaint or "compl." in citations herein are to the operative complaint in intervention (DE 40).

31), who must comply with the requirements of the program in order to be reimbursed for services. (Id. ¶¶ 34-39). As relevant here, Medicare requires doctors to certify that they have abided or will abide by program policies, (id. ¶¶ 35-41), provide services only when they are medically necessary, (id. ¶¶ 65-66), and keep accurate records. (Id. ¶ 67). Medicaid and TRICARE have similar requirements. (Id. ¶¶ 72-73, 76-78, 80-81, 89-92, 94-95). The programs receive millions of claims per year, and it is not feasible to audit each claim. (Id. 54, 85). The North Carolina Department of Health and Human Services, Division of Health Benefits (NCDHB) administers the Medicaid program in the state of North Carolina. (Id. ¶ 70).

When testing for the diseases at issue in this case, peripheral arterial disease ("PAD") and coronary artery disease ("CAD"), physicians often order non-invasive tests before or as an alternative to invasive procedures. (Id. at ¶¶ 102-04, 115-23, 125-126). The complaint alleges that individual defendants intentionally falsified the results of non-invasive tests, ordered invasive tests even after non-invasive tests returned normal results, or failed to conduct non-invasive tests at all as part of a scheme to bill the federal programs for more lucrative, invasive tests. (E.g., id. ¶¶ 165-167). Individual defendants allegedly each performed and billed the federal programs for all the following invasive diagnostic procedures: leg catheterizations to test for PAD, coronary catheterization imaging to test for CAD, and cardiac stent placement, also to diagnose CAD. (Id. ¶ 3).

As part of the alleged scheme, individual defendants held a meeting with relator in 2014. (Id. ¶ 170). In that meeting, defendant Sinna "instructed [relator] to find symptoms to justify procedures, and . . . explained that referring patients for leg and carotid imaging procedures would generate revenue for [r]elator's bonuses (including during stent follow-up visits)." Id. Defendants Daka and Sinna held an additional meeting with relator in 2015, in which they

pushed [relator] to increase his referrals for leg catherizations and cardiac stents, instructed him to increase leg catheterizations (that were performed in office) and document that patients had pain in their leg when walking as a reason for PAD procedures even if false, and further instructed him to refer all patients for cardiac catheter angiograms and stents if their Troponin blood test were 0.5 or greater, regardless of whether the Triponin level could be explained by other indicated medical conditions.

(Id. ¶ 172).

## DISCUSSION

A.  Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).[4]

B.  Analysis

Defendants argue that the FCA claims should be dismissed under Fed. Rs. Civ. P. 9(b) and 12(b)(6) where the complaint does not contain facts sufficient to support allegations that the alleged representations were material to the government's payment decision, that the defendants knowingly submitted false claims or made false representations, and that the individuals engaged in conspiracy. Defendants argue further that the complaint fails to specify which individuals

---

[4] Throughout this order, internal quotation marks and citations are omitted unless otherwise specified..

5

engaged in particular kinds of conduct. In addition, defendants move to dismiss those causes of action arising from common law where they are dependent on the viability of the FCA claims.

The government's action is based upon the alleged submission of false claims and false statements to the government in violation of the False Claims Act and the North Carolina False Claims Act. Those statutes provide liability, in pertinent part, for:

> any person who--
>
> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
>
> (C) conspires to commit a violation of subparagraph (A) [or] (B).

31 U.S.C. § 3729(a); see N.C. Gen. Stat. § 1-607(a).

To state a False Claims Act claim, a plaintiff must allege: "1) that the defendant made a false statement or engaged in a fraudulent course of conduct; 2) such statement or conduct was made or carried out with the requisite scienter; 3) the statement or conduct was material; and 4) the statement or conduct caused the government to pay out money or to forfeit money due." United States ex rel. Harrison v. Westinghouse Savannah River Co., 352 F.3d 908, 913 (4th Cir. 2003) ("Harrison II").

In addition, plaintiff's claims under the False Claims Act, as well as plaintiff's common law claims sounding in fraud, are subject to pleading requirements of Fed. R. Civ. P. 9(b). Rule 9(b) requires a plaintiff to describe "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999) ("Harrison I").

"Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The purposes of Rule 9(b) are to 1) "ensure[] that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of," 2) "protect defendants from frivolous suits," 3) "eliminate fraud actions in which all the facts are learned after discovery," and 4) "protect[] defendants from harm to their goodwill and reputation." Id.

In the context of a False Claims Act case, "[a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied 1) that the defendant[s have] been made aware of the particular circumstances for which [they] will have to prepare a defense at trial, and 2) that plaintiff has substantial prediscovery evidence of those facts." Id. In addition, where a complaint asserts a scheme to defraud, a complaint may "outline the dealings" that "form a solid foundation" for the plaintiff's theory of liability. United States ex rel. Bunk v. Gov't Logistics N.V., 842 F.3d 261, 276 (4th Cir. 2016); see United States ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 190 (5th Cir. 2009) (holding that in a False Claims Act case, it is sufficient to allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted").

1. Particularized claims against individual defendants

Defendants argue first that plaintiffs have not stated sufficient facts to plead their claims with particularity against individual defendants. As explained above, Rule 9(b) requires those bringing claims sounding in fraud to describe "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." Harrison I, 176 F.3d at 784. Here, the complaint alleges the time, place, and contents of the false representations: multiple types of repeating patterns of claims and supporting

7

information for diagnostic procedures, including leg catheterizations for Peripheral Arterial Disease ("PAD"), coronary catheterization imaging for coronary artery disease ("CAD") and cardiac stents, (see compl. ¶ 3), sent electronically, (see id. ¶¶ 47-49), between 2014 and 2019. (see id. ¶ 188). The contents of the false representations include dozens of specific allegations that defendants conducted and billed federal health insurance programs for invasive catheterization and stent placement procedures after less invasive diagnostics either returned normal results or simply were not conducted, each of which are identified by patient initials and date of procedure. (See id. ¶¶188-213).

Contrary to defendants' assertion that "the [g]overnment fails to identify which of the four . . . [d]efendant physicians engaged in the conduct at issue," (DE 53 at 7), the complaint alleges that each individual defendant submitted false claims for each diagnostic procedure described in the complaint. (Compl. ¶ 212) ( "[d]efendants Daka, Sinna, Jayawardena and Thomas each caused false catheterization and stent claims, and each acted with at least reckless disregard regarding the accuracy of these claims."). Accordingly, viewing the allegations in the light most favorable to plaintiffs, it is reasonable to infer that each individual defendant caused false claims to be submitted.

Defendants' argument in its reply brief that "Sinna is not an interventional cardiologist, making the [g]overnment's global accusations of false claims . . . unreliable," (DE 60 at 4), fails where the court is bound to accept the facts alleged in a complaint as true at the motion to dismiss stage. Contrary facts asserted by defendants are not proper for consideration at this juncture, but rather may be raised at a later juncture in the case. Defendants' reliance on United States ex rel. Walner v. NorthShore University Health System, 660 F.Supp.3d 891 (N.D. Ill. 2009) ("Walner") is similarly misplaced. First, this case and the Seventh Circuit opinions to which it cites are not

binding on this court. Additionally, Walner is distinguishable where the plaintiff "failed to plead the specific date" of the surgery at issue, the hospital at which it was performed, "who agreed with whom, how they agreed, how they decided to file a false claim, who made the alleged misrepresentation, who filed the allegedly false claim, the method by which it was filed, and how much the payment was for." Id. at 897-98. Those factual allegations are all made in the pleadings before the court. (See e.g., compl. ¶¶ 41, 59, 93, 170-72, 178, 183, 185, 200-01, 203-05; 207, 209). Defendant's reliance on United States ex rel. Clausen v. Laboratory Corporation of America, 290 F.3d 1301 (11th Cir. 2002), which upheld the dismissal of FCA claims for failure to allege specific "information about claims actually submitted," id. at 1313, is similarly misplaced: the case is distinguishable where the instant complaint alleges that defendants "submitted claims for payment to Government health care programs under CPT codes 36247, 93454, 93458, 93459 and 92928 for services that were not reasonable and necessary for . . . diagnosis or treatment." (Compl. ¶ 59).

2. Materiality

Defendants argue that the government does not adequately allege that any misrepresentation was material to the government's payment decision. "A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." Universal Health Services, Inc. v. United States, 579 U.S. 176, 181 (2016) ("Escobar"). "[A] material falsehood [is] one that [is] capable of influencing the [g]overnment's decision to pay." United States v. Triple Canopy, Inc., 857 F.3d 174 (4th Cir. 2017). "[M]ateriality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." Escobar, 579 U.S. at 193. While "failure to follow a minor or insubstantial requirement will not suffice to show

9

materiality," United States ex rel. Taylor v. Boyko, 39 F.4th 177, 190 (4th Cir. 2022), a plaintiff may show materiality by alleging that the government likely would not have paid the claim had it known of the misrepresentation. See Escobar, 579 U.S. at 181, 194.

The complaint contains numerous allegations that defendants' misrepresentations affected the government's decision to pay. Section III, which defendants deride as "general conclusory allegations the majority of which summarize the Medicare, Medicaid, and Tricare programs," (DE 53 at 2), explains that medical necessity is an express requirement for reimbursement, (compl. ¶¶ 65-66, 77-78, 89-91), and that physicians must certify that services performed were medically necessary or that they have complied with program requirements before being reimbursed. (See compl. ¶¶ 51, 73, 93). The complaint alleges additionally that where federal programs receive millions of claims each year, "the Medicare program relies upon providers to comply with Medicare requirements and trusts providers to submit truthful and accurate certifications and claims," (compl. ¶ 54), and that "because it would not be feasible to review medical documentation before paying each claim, NCDHB [North Carolina's Medicaid administration agency] generally makes payments after the Claims Forms are submitted with the Provider's certification that the claims were medically necessary." (Compl. ¶ 85). Where the complaint alleges that medical necessity is a central requirement of all three programs, it sufficiently pleads that defendant's alleged failure to disclose noncompliance with that requirement had a material effect on the government's decision to pay.

Defendants' argument that dismissal is warranted because "the Government's conclusory and formulaic allegations based primarily on information and belief simply do not pass muster under Rule 9(b) standards," (DE 53 at 14), and that more than 50% of" the "allegations purportedly constituting violations of the False Claims Act" are based upon information and belief, (see id. at

2), is unconvincing. Multiple allegations pertinent to defendants' false claims and statements are not based upon information and belief. (See, e.g., compl. ¶¶ 146, 149-154, 156-57, 15-162. Moreover, allegations not made on information and belief provide factual support for the remaining allegations made on information and belief. Thus, dismissal is not required due to the presence of allegations made on information and belief.

3. Scienter

Defendants argue that the complaint does not contain allegations sufficient to draw an inference that defendants acted knowingly under the FCA. The False Claims Act does "not punish honest mistakes or incorrect claims submitted through mere negligence," United States ex rel. Owens v. First Kuwaiti General Trading & Contracting Co., 612 F.3d 724, 728 (4th Cir. 2010), but requires "that a person has actual knowledge of the information, acts in deliberate ignorance of the truth or falsity of the information, or acts in reckless disregard of the truth or falsity of the information." Escobar, 579 U.S. at 182.

In a section of the complaint titled "Ferncreek Defendants Knowingly Submitted False Claims," the government alleges facts that support an inference that individual defendants had actual knowledge of the falsity of the statements and claims that they submitted to federal programs. (Compl. ¶¶ 29-33). These include allegations that individual defendants "made and used false records, including stress test findings, angiographic findings, physician notes of patient symptoms, and other parts of medical records to support their false claims," (compl. ¶ 165), "knew the angiograms and medical records for the leg catheterizations and coronary stents that they billed often demonstrated less than 50 percent stenosis, rather than the stenosis percentage claimed," (compl. ¶ 167), held a meeting with relator and individual defendants, in which defendant "Sinna instructed [r]elator . . . to find symptoms to justify procedures, and . . . explained that referring

11

patients for leg and carotid imaging procedures would generate revenue for [relator's] bonuses. . . ," (compl. ¶ 170), and "knew that performing cardiac catheterizations, despite normal nuclear stress test that demonstrated no intervention was necessary, was contrary to the accepted standard of medical practice," (compl. ¶ 179). The complaint additionally alleges that defendants Daka and Sina "pushed [relator] to increase his referrals for leg catheterizations and cardiac stents . . . and document that patients had pain in their leg when walking as a reason for PAD procedures even if false," (compl. ¶ 172), and that defendant Daka "instructed [relator] to falsify patient records," (compl. ¶ 173). Where over four pages of the complaint contain detailed scienter allegations, plaintiffs plausibly allege that defendants acted with the requisite knowledge to violate the FCA.

Defendants argue that where medical necessity is a subjective assessment made only by qualified professionals, not a fact capable of proof or falsification, the complaint fails to plead facts that would support a finding that defendants acted with the requisite knowledge. (See DE 53 at 15). This argument ignores allegations in the complaint that defendants disregarded or falsified facts which bore on a finding of medical necessity, including that defendants "knew that their stress tests, ultrasounds, angiographic findings, recorded patient symptoms, and other medical records . . . were not accurate, and were routinely overstated," (compl. ¶ 166), instructed relator to "document that patients had pain in their leg when walking . . . even if false," (compl. ¶ 172), and "knowingly disregarded 'normal' stress test results." (Compl. ¶ 31). It is these secondary facts, not necessarily the judgment of medical necessity itself, that support an inference that defendants acted knowingly.

    4.    Conspiracy

Defendants argue that the complaint fails to allege a conspiracy. Though the Fourth Circuit has not definitively described the elements of a False Claims Act conspiracy in a reported opinion,

12

it is well settled that a plaintiff must show 1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim reimbursed by the government and 2) at least one act in furtherance of the agreement. See 31 U.S.C.A. § 3729(a)(1)(C); United States ex rel. Godfrey v. KBR, Inc., 360 Fed.Appx. 407, 413 (4th Cir. 2010) (upholding the dismissal of a conspiracy claim for failure to show an agreement without reaching the second requirement of an act in furtherance of the conspiracy); United States ex rel. Farmer v. City of Houston, 523 F.3d 333, 343 (5th Cir. 2008) ("[Relator] ultimately must be able to show 1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid . . . and 2) at least one act performed in furtherance of that agreement."); United States ex rel. DeCesare v. Americare In Home Nursing (E.D.V.A. 2008) ("an FCA conspiracy requires 1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim reimbursed by the government and 2) at least one act performed in furtherance of that agreement.").

As cited above, the complaint states that all four individual defendants "had a 2014 meeting with [relator] in which [defendant] Sinna instructed [relator] to find symptoms to justify procedures, and . . . Sinna explained that referring patients for leg and carotid imaging procedures would generate revenue." (Compl. ¶ 170). Defendants Daka and Sinna allegedly held a second meeting, in which they instructed relator again to increase certain lucrative procedures and falsify records. (See compl. ¶ 171). The complaint alleges additionally that defendants submitted claims arising from these procedures for payment. (See e.g., compl. ¶ 59). These paragraphs tend to show that individual defendants agreed to seek reimbursement from the government on false or fraudulent claims, and that at least one of them acted in furtherance of that agreement.

13

5. Common Law Claims

Defendants argue that the government's causes of action for common law fraud, unjust enrichment, and payment by mistake are deficient where they are "premised on the submission of the false claims that form the basis of [the] FCA causes of action." (DE 53 at 16). Where the court declines to dismiss the FCA claims, this argument fails and the government's common law claims may proceed.

## CONCLUSION

Based on the foregoing, defendants' motion to dismiss (DE 52) is DENIED. Where the court stayed previously case scheduling conference activities pending decision on the instant motion, the court now LIFTS such stay. Where the parties superseded their first set of consent motions for protective orders by subsequent motions, the consent motions filed January 10, 2023 (DE 66-67) are TERMINATED AS MOOT. The second set of motions for protective orders (DE 68-69) will be addressed by separate order. An initial order regarding planning and scheduling will follow so that the parties can submit a new Rule 26(f) report for entry of a case management order.

SO ORDERED, this 2nd day of March, 2023.

_____
LOUISE W. FLANAGAN
United States District Judge